UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CRAIG KIMMEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-144 |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

I. INTRODUCTION

Plaintiff Craig Kimmel seeks judicial review[1] of the final decision of the Defendant

Commissioner of Social Security, Jo Anne Barnhart, who found that Kimmel was not entitled to

Supplemental Security Income ("SSI") or Social Security Disability Insurance Benefits ("DIB").

As the reader will soon learn, Kimmel's appeal is successful.

In short, the ALJ's decision to discredit Kimmel's testimony is not supported by

substantial evidence; furthermore, the ALJ erred when giving the opinions of the State Agency

physicians greater weight than the opinion of Kimmel's pain management specialist. The ALJ's

determination to afford the opinion of Kimmel's family doctor little weight, however, was

supported by substantial evidence. The Commissioner's final decision, therefore, will be

REVERSED and REMANDED for rehearing.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

**II. FACTUAL AND PROCEDURAL BACKGROUND**[2]

At the time of his hearing on November 8, 2004, before the Administrative Law Judge ("ALJ"), Kimmel was fifty years old. (Tr. 322-23.) He was employed as a maintenance mechanic at a hospital until 1990 and then worked as a machine operator at various factories from 1990 until he quit working in 2003, claiming he could no longer work due to back pain, loss of balance, knee problems, and depression.[3] (Tr. 40, 41, 81.)

On February 22, 2000, Kimmel saw Doctor Isa Canavati, a neurosurgeon, complaining of constant "cervical pain with radiation to the right upper extremity" that was not relieved by a previous steroid injection and reporting that he had a lumbar laminectomy in 1989 for disc herniation. (Tr. 131.) Dr. Canavati noted significant tenderness and spasms in Kimmel's cervical area with restriction of all motions of the cervical spine, and an MRI revealed a large central disc herniation with cord compression; therefore, he recommended an anterior cervical discectomy and fusion, with plate fixation at the C5-6 level. (Tr. 132.)

After Kimmel underwent the recommended treatment, he visited Dr. Cavanati on April 3, 2000, reporting complete resolution of arm pain and numbness and a decrease in neck pain. (Tr. 127.) As the the X-rays of the cervical spine were satisfactory, Dr. Cavanati released Kimmel to return to work, placing him on a thirty-pound lifting restriction for one month. (Tr. 127.)

Kimmel returned to Dr. Canavati on September 7, 2000, reporting that since his lumbar

---

[2] The administrative record in this case is voluminous (342 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] Because Kimmel does not dispute the ALJ's findings regarding his depression, the Court will focus its inquiry on those findings pertaining to his physical conditions.

2

surgery in 1989, he experienced lower back pain radiating into both lower extremities that had

increased to the point where he was now no longer able to perform his job. (Tr. 123.) He claimed

that standing and walking aggravated the pain but that he obtained relief by sitting or lying

down. (Tr. 123.) On examination, Dr. Canavati found diffused tenderness in Kimmel's

mid-lumbar area with increased pain on anterior flexion and rotation and found his motion

restricted in the lumbar spine by approximately 50%. (Tr. 124.) Dr. Canavati's impression was

intractable mechanical low back pain. (Tr. 124.)

A few days later, Dr. Canavati reviewed Kimmel's MRI, which showed degenerative

disk disease with bilateral foraminal stenosis and disc protrusion, and significant modic changes

involving the end plate. (Tr. 121.) Noting that three epidural injections, physical therapy, and

various anti-inflammatory medications had not provided Kimmel lasting relief, he recommended

L5-S1 decompression, a discectomy, and instrumented fusion. (Tr. 121.)

On September 21, 2000, Kimmel underwent the recommended surgery and saw Dr.

Canavati for follow-up on November 2, reporting that he was "well," with the exception of

minimal residual discomfort in the lower back. (Tr. 87-88, 116.) As X-rays of the lumbar spine

were deemed satisfactory, Dr. Canavati recommended a thirty-pound lifting restriction. (Tr.

116.)

Upon Kimmel's December 5 visit, Dr. Canavati observed that Kimmel had some

discomfort in the lower back and left upper thigh but that the lumbar X-rays were satisfactory.

(Tr. 115.) Dr. Canavati recommended a gradual increase in activities, continuing Kimmel on the

thirty-pound lifting restriction but placing him on leave from work for another month. (Tr. 115.)

Kimmel reported to Dr. Canavati on March 7, 2001, that he had complete resolution of his lower

extremity pain, that he had some mild residual stiffness in his lower back, and that he was back to work full-time. (Tr. 111.)

On October 3, 2001, Kimmel saw his family doctor, Doctor James Stapel, for evaluation of an injured right knee causing severe pain. (Tr. 139.) He went to the emergency room the day before, but the X-ray was negative. (Tr. 139.) Suspecting severe internal derangement of the knee, Dr. Stapel ordered an MRI, which revealed large joint effusion and "bone bruising proximal lateral tibial plateau laterally." (Tr. 139-40.)

Kimmel did not visit Dr. Stapel again until May 23, 2002, when he complained of ongoing chronic back pain that was increasing in severity and reported that various pain relievers did not relieve his pain. (Tr. 139.)  Dr. Stapel referred Kimmel to Dr. Tsang for pain management, increased his Duragesic Patch and Elavil dosage, and prescribed Bextra. (Tr. 139.)

Kimmel returned to Dr. Stapel on October 29, 2002, reporting that he was seeing Dr. Tsang for pain management and that overall he was doing well, but that in the last two days he had severe lumbar pain radiating down his right leg. (Tr. 138.) Dr. Stapel found a restricted range of motion and spasms, adding Flexeril to Kimmel's medication regime. (Tr. 139.)

On January 23, 2003, Kimmel told Dr. Stapel that he had been switched from Dr. Tsang to Dr. Coates, who was not giving him good treatment, and complained that because his pain was increasing, he was missing work. (Tr. 137.) Dr. Stapel referred Kimmel to Doctor Joseph Fortin, a pain management specialist, for evaluation of his chronic low back pain. (Tr. 137.)

Although Kimmel complained of periodic low back pain and right lower extremity pain during his January 27 visit to Dr. Fortin, he reported that he was still able to perform normal daily activities. (Tr. 292-93.) Dr. Fortin found Kimmel's range of motion in his extremities to be

within functional limits, in his lumbar spine to be mildly restricted with flexion, and in all other planes to be moderately restricted. (Tr. 291.) Palpitation disclosed tenderness with anterior translation of the L3, L4, and L5 vertebrae; tenderness of the bilateral L3-4, L4-5, and L5-S1 articular pillars; and pain to the left piriformis muscle. (Tr. 291.) Dr. Fortin's impression was failed back surgery syndrome, with the need to rule out lumbar internal disc disruption, lumbar herniated nucleus pulposus, and lumbar radiculopathy. (Tr. 290.) He placed no work restrictions on Kimmel, advising him to try Zanaflex in addition to his other medications. (Tr. 289.)

Kimmel returned to Dr. Fortin for re-examination on February 7, reporting that his pain had worsened, that he was no longer able to perform normal daily activities, and that he missed his last four days of work. (Tr. 253.) Dr. Fortin excused Kimmel from work for these days due to low back pain and medication side effects. (Tr. 255.)

On March 7, Kimmel complained that his pain had worsened to the point that it was now constant. (Tr. 257.) Dr. Fortin noted that a February 28 EMG of Kimmel's bilateral lower extremities showed mild left peroneal neuropathy but that there were no other changes since February 7.  (Tr. 235-36, 250.) He placed Kimmel off work until diagnosis and treatment were complete. (Tr. 251.)

On March 13, Dr. Fortin performed a lumbar post myelography/computerized tomography, diagnosing a S1-S2 motion segment anomaly suggesting attenuation, L4-5 posterior annular prominence, and extensive L5-S1 post-operative degenerative changes. (Tr. 242-43.)

Kimmel saw Dr. Fortin for a re-examination on March 28, reporting that his overall level of discomfort had improved. (Tr. 219.) On May 2, Dr. Fortin noted that Kimmel had slight improvement in lumbar pain and that his symptoms were otherwise unchanged. (Tr. 209.) On

May 16, Kimmel reported that his overall discomfort level had again improved, and Dr. Fortin noted Kimmel was receiving adequate pain control. (Tr. 202-03.) Although Kimmel reported that the pain in his right thigh made it difficult for him to work, Dr. Fortin did not place any work restrictions on him. (Tr. 202.)

On July 7, Kimmel returned to Dr. Stapel to discuss his back pain, hoping Dr. Stapel would place him on work restriction. (Tr. 300.) Dr. Stapel informed him that Dr. Fortin was "probably more acquainted with his scenario right now" than he, encouraging Kimmel to obtain work restrictions from Dr. Fortin. (Tr. 300.)

On July 21, Kimmel reported to Dr. Fortin that his pain had gotten worse and that he had quit his job. (Tr. 199.) Dr. Fortin found that his lumbar range of motion was moderately restricted, that the strength and tone of his lower extremities were intact, that sensation was intact except for decreased sensation to light touch in the right calf, and that deep tendon reflexes of the lower extremities were intact; however, he placed Kimmel off work until the recommended diagnostic and treatment work-ups were complete. (Tr. 197.)

On August 28, Dr. Fortin wrote a letter to the Disability Determination Bureau regarding Kimmel's ability to do work-related physical activities, diagnosing lumbar degenerative disc disease, radicultis, failed back surgery syndrome, and neuropathy. (Tr. 192.) He opined that Kimmel must change positions every twenty minutes when sitting; that he must rest every twenty minutes when standing or walking; that he not could lift more than ten pounds; and that he was "limited" in his ability to bend, twist, reach above the shoulders, carry, and travel. (Tr. 192.) Dr. Fortin believed, however, that Kimmel was not limited in his ability to perform neck flexion and extension, perform a neck-lateral bend, reach at shoulder level, handle objects, hear,

6

or speak. (Tr. 192.)

On September 19, 2003, Doctor Michael Holton performed a consultative physical examination at the request of the Disability Determination Bureau. (Tr. 148-151.) Kimmel claimed he was experiencing continuous pain and stiffness resulting from a history of failed back surgeries. (Tr. 148.) He also reported an ability to perform dressing and hygiene measures independently, except that his spouse occasionally helped with washing his lower extremities and with putting on socks. (Tr. 148.) Furthermore, he claimed that he could sit for two hours without changing positions, could stand for thirty to sixty minutes, and could walk six to eight blocks without significant increased discomfort or difficulty. (Tr. 148.)

On physical examination, Kimmel had a normal gait and station and had no perceived difficulty in walking on heels and toes, tandem walking, hopping, or squatting, except for mild bilateral extremity stiffness. (Tr. 149.) Finding palpable tenderness of the paralumbar and paracervical areas, some slight effusion of the right knee with no definite gross joint deformities, normal muscle strength and tone, normal deep tendon reflexes, and normal finger manipulative abilities, Dr. Holton diagnosed chronic neck and low back problems post surgery, recurring right knee pain post surgery with slight effusion, and depression. (Tr. 149-50.)

Dr. Landwehr completed a "Physical Residual Functional Capacity Assessment" for the State Agency on October 28, opining that Kimmel could occasionally lift up to twenty pounds, could frequently lift up to ten pounds, could stand and/or walk at least two hours in an eight-hour workday, and could sit about six hours in an eight-hour workday. (Tr. 157.) He further opined that Kimmel's ability to push and/or pull was unlimited in all of his extremities; that he could frequently balance; that he could occasionally climb ramps and stairs, stoop, kneel, crouch, and

7

crawl; and that he could never climb ladders, ropes, and scaffolds. (Tr. 157-58.)

On October 7 and November 11, Kimmel returned to Dr. Fortin for re-examination. (Tr. 186-89.) On November 11, Kimmel complained of left-sided neck pain, upper left extremity pain, left hand numbness, left shoulder pain waking him at night, and dropping objects from his left hand. (Tr. 181.) On physical examination his cervical range of motion was mildly restricted, his gait and station were mildly antalgic, and there was tenderness at the C6 and C7 vertebral body and tender points of the left C5-6 and left C6-7 articular pillars. (Tr. 182.) Dr. Fortin added failed neck surgery syndrome to the list of medical impressions. (Tr. 182.)

On January 9, 2004, Dr. Fortin wrote another letter to the Disability Determination Bureau, opining that Kimmel was "restricted" in his ability to bend, twist, perform neck flexion and extension, perform a neck-lateral bend, and reach above shoulder level; and that his ability to reach at shoulder level was now "limited." (Tr. 178.) The rest of his opinion, however, remained unchanged from his previous letter. (Tr. 178.)

From the record, it appears that Kimmel did not see a doctor from December 2003 until August 11, 2004, when he visited Dr. Stapel, who noted that he had not seen Kimmel for "quite a while." (Tr. 299.) Kimmel reported going to Spine Technology on a regular basis, that he had control of his symptoms, but that he was still very lethargic and weak. (Tr. 299.) Finding the labs done at Spine Technology unremarkable except that Kimmel's testosterone level was dramatically low, Dr. Stapel prescribed a testosterone patch. (Tr. 299.) Kimmel saw Dr. Stapel again on September 10, reporting that he was starting to have more energy. (Tr. 299.)

On October 8, Kimmel went to Dr. Stapel's office to discuss his continuing back pain, complaining that he was having more cervical pain on his right side and that he felt he was

unable to work. (Tr. 299.) Dr. Stapel agreed to complete a "Medical Source Statement of Ability To Do Work-Related Activities," which he submitted on October 31. (Tr. 310-313.) Dr. Stapel opined that Kimmel could only occasionally lift and carry less than ten pounds; could stand and/or walk for less than two hours in an eight-hour workday; could sit less than six hours in an eight-hour workday; could occasionally climb and balance; and could never kneel, crouch, crawl, or stoop. (Tr. 310-11.) Furthermore, Dr. Stapel opined that the following manipulative functions were limited: reaching, handling, fingering, and feeling. (Tr. 312.)

Kimmel filed concurrent claims for SSI and DIB on August 4, 2003, alleging a disability onset date of April 15, 2003. (Tr. 34-36.) ALJ Frederick McGrath conducted a hearing on November 8, 2004, and rendered an unfavorable opinion on December 21, 2004. (Tr. 9-19.) The Appeals Council denied Kimmel's request for review. (Tr. 3-5.) Kimmel filed here on August 22, 2005, seeking review of the Commissioner's decision, and the matter is now fully briefed.

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. DISCUSSION

### A. Legal Framework

Under the Act, a plaintiff is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Kimmel is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of

performing work in the national economy.[4] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next

step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245

F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the

inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with

the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*,

227 F.3d 863, 868 (7th Cir. 2000).

### B. The ALJ's Decision

In a written decision issued on December 21, 2004, the ALJ determined that Kimmel was

not disabled. (Tr. 9-19.) The ALJ decided in Kimmel's favor on steps one and two, finding that

Kimmel's physical impairments were severe, but also finding that he did not meet a listing at

step three. (Tr. 17.) He then ascertained that Kimmel had an RFC "to perform light unskilled

work absent climbing, [with] the option to sit and stand for 30 minutes at a time." (Tr. 17.) Based

on this RFC, the ALJ found at step four that Kimmel could not perform his past relevant work.

(Tr. 18.)  However, relying on the testimony of a vocational expert, the ALJ found at step five

that Kimmel was capable of performing work in the national economy. (Tr. 16-18.) Therefore,

Kimmel was not entitled to SSI or DIB. (Tr. 19.)

In reaching this decision, the ALJ gave greater weight to the opinions of the State

Agency physicians than to the opinion of Dr. Fortin, finding that Dr. Fortin's two letters

regarding Kimmel's ability to do work-related activities were not supported by Dr. Fortin's own

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

medical records and were inconsistent with the record as a whole. Likewise, the ALJ gave little weight to the opinion of Dr. Stapel, opining that because he hadn't treated Kimmel for almost one year, Dr. Stapel's "Medical Source Statement" was seemingly based on either Kimmel's subjective complaints or Dr. Fortin's medical findings. Furthermore, the ALJ discredited Kimmel's accounts of his physical limitations, concluding his testimony appeared to be "self-serving rather than candid" because it was inconsistent with Dr. Horton's medical findings. (Tr. 15.)

Kimmel advances three arguments for reversal: (1) the ALJ improperly discredited Kimmel's testimony; (2) he improperly evaluated the opinion of Dr. Fortin; and (3) he improperly rejected the opinion of Dr. Stapel. These arguments will be discussed in turn.

### C. The ALJ's determination that Kimmel was not credible is not supported by substantial evidence

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If, however, the reasoning behind the ALJ's credibility determination "does not build an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), this Court must remand because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness." *Carrandine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2000).

Here, the ALJ opines that Kimmel's testimony appeared to be "self-serving rather than candid" because Kimmel testified he was legally blind in the left eye, while Dr. Holton reported 20/20 corrected visual acuity per a Snellen chart. Perfect visual acuity, however, does not

preclude one from being legally blind, as the term is defined as "corrected visual acuity of

20/200 or less . . . *or* a visual field of no more than 20 degrees . . . ." Charles B. Clayman, *The*

*American Medical Association: Encyclopedia of Medicine* 180 (1989) (emphasis added). When

asked about how his blindness affected his vision, Kimmel testified that he has "blurred

peripheral vision."  (Tr. 327); therefore, his testimony that he was legally blind appears to be

arguably accurate, absent any medical evidence pertaining to Kimmel's visual field.

Furthermore, the ALJ discredits Kimmel because although he testified that he had great

difficulty in dressing and that he had no ability to perform fine finger manipulations, he reported

to Dr. Horton that he could generally perform dressing and hygiene measures independently, and

Dr. Holton found that Kimmel's fine finger manipulative abilities appeared normal. The ALJ,

however, failed to "build a logical bridge" between the evidence and the result that Kimmel was

not credible, as Kimmel testified that these problems arose only two to three months before the

hearing on November 8, 2004. (Tr. 235-36). Thus, there appears to be nothing inconsistent with

his testimony regarding these problems and Dr. Horton's medical report completed over a year

prior to the hearing.[5]

### D. The ALJ erred when giving greater weight to the opinions of the State Agency physicians than to the opinion of Dr. Fortin

The opinion of a treating physician should be given great weight in disability

determinations because of his or her greater familiarity with the claimant's conditions and

circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). More specifically, if the ALJ

---

[5] It seems unusual to discredit Kimmel on the basis of his alleged blindness and inability to perform fine finger manipulations, conditions only briefly discussed at the hearing and not the basis for Kimmel's disability claim, while the ALJ makes no mention about the credibility of Kimmel's allegations of back pain.

finds that the treating physician's opinion is "well supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record," the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

In the event the treating physician's opinion is not given controlling weight, the Commissioner applies the following factors to determine the weight given to the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," because "a treating physician may bring biases to an assessment." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat him, decides whether a claimant is disabled. *Id.*; 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, substantial evidence supports not affording Dr. Fortin's opinion controlling weight, as the two letters he wrote to the Disability Determination Bureau, which greatly limited Kimmel's ability to perform work-related activities, were not "well supported by medically acceptable [evidence]" and were "inconsistent with the other substantial evidence in [the]

record." *See* 20 C.F.R. § 404.1527(d)(2). The ALJ noted that these letters are not supported by

Dr. Fortin's own "medical treatment records of general improvement in [Kimmel's] pain

complaints," and his own "minimal" objective findings "that were generally noted to be

unremarkable to mild."[6] (Tr. 14.)   In addition, he concluded that Dr. Fortin's second letter was

inconsistent with Dr. Holton's examination, "which was essentially unremarkable," just three

weeks later.[7] (Tr. 14.)

Kimmel specifically attacks two inconsistencies as not supported by substantial evidence.

The ALJ opined that Dr. Fortin's weight lifting restriction of no greater than ten pounds "far

exceed[s] even those given by [Kimmel's] treating back surgeon, Dr. Canavati, [whose] lifting

restriction just 30 days post lumbar back fusion was 30 pounds." (Tr. 14.) Kimmel argues that

Dr. Canavati's weight restriction was given nearly three years before Dr. Fortin's assessment,

and  since that time Kimmel's pain "had increasingly debilitated" him. (Opening Br. 19.)

---

[6] Kimmel makes a truncated attack on the ALJ's characterization of Dr. Fortin's objective findings as
"minimal," arguing that this is "merely a conclusion" drawn by the ALJ. (Opening Br. of Pl. in Social Security
Appeal Pursuant to L.R. 7.3 18.) The ALJ is entitled, however, to draw such a conclusion, as supportability is one of
the factors used to decided what weight to give a medical opinion. 20 C.F.R. § 404.1527(d)(3) ("The more a medical
source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more
weight we will give that opinion."). In any event, this characterization is not determinative, as Dr. Fortin's objective
findings, even if more than "minimal," do not support his opinions provided to the Bureau.
       Kimmel also alleges that "the ALJ claims that [the] differences between Dr. Fortin's two [letters to the
Bureau] undercut his opinion," arguing that these differences, in fact, do not undercut the opinion. (Opening Br. 18.)
The ALJ, however, never bases the lack of weight given to Dr. Fortin's opinion on any perceived inconsistencies in
these two letters, merely stating that the second letter "provided an even more limited assessment" than the first. (Tr.
14.) Instead, the ALJ concludes that both letters are inconsistent with other evidence in the record.

[7] Kimmel claims that the ALJ engaged in improper speculation when he opined that Dr. Fortin's assessment
was in "stark contrast" to Dr. Holton's examination, arguing that because Dr. Holton's report contained no opinions
regarding Kimmel's ability to work, his objective medical findings cannot undercut Dr. Fortin's letters. This
argument is unpersuasive because comparing Dr. Fortin's opinions to other objective medical evidence in the record
is *exactly* what the ALJ is supposed to do. 20 C.F.R. § 404.1527(d)(2) (If a treating physician's opinion "is
well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in your case record, [the ALJ] will give it controlling weight.").

However, just three months prior to his first letter to the Bureau, Dr. Fortin declined to place

Kimmel on any work restrictions, noting that Kimmel was receiving adequate pain control, even

though Kimmel claims that by this time "he had to quit his work because of the worsening of his

pain." (Opening Br. 18.) Dr. Stapel also refused to place Kimmel on work restriction just one

month prior to the letter. Furthermore, the Stage Agency physician's RFC evaluation opined that

Kimmel could lift a maximum of twenty pounds. Thus, substantial evidence supports the ALJ's

determination that Dr. Fortin's weight lifting restriction was excessive given the other evidence

in the record.

The ALJ also opined that Dr. Fortin's "very limiting" letters were inconsistent with

Kimmel's daily activities. Kimmel responds by focusing only on Dr. Fortin's limitation that

Kimmel must change positions every twenty minutes, arguing that this limitation is consistent

with his testimony that he can mow the lawn for only fifteen to twenty minutes, his answers to

the Social Security Administration's questionnaire indicating that the needs to alternately sit and

stand and take breaks during his daily activities, and his wife's responses indicating he needs to

alternate positions. Kimmel testified at the hearing, however, that he could "sit for a lengthy

period of time . . . for up to 45 minutes to an hour." (Tr. 330.)

Furthermore, Kimmel centers his argument around merely one aspect of Dr. Fortin's

letters that the ALJ deemed "very limiting" overall.[8]  Despite all of Dr. Fortin's limitations,

Kimmel's answers to the Social Security Administration's questionnaire indicate that he does

---

[8] In addition to alternating positions every twenty minutes, Dr. Fortin opined in his first letter that Kimmel
could not lift more than ten pounds and that he was "limited" in his ability to bend, twist, reach above the shoulders,
carry, and travel. His second letter added that Kimmel was "restricted" in his ability to bend, twist, perform neck
flexion and extension, perform a neck-lateral bend, and reach above shoulder level and that Kimmel was "limited" in
his ability to reach at shoulder level.

16

household chores, including doing the dishes, laundry, sweeping, dusting, yard work, and

home/auto repairs. (Tr. 49-50.) Additionally, mental status examiner Kenneth Bundza noted that

Kimmel drove his motorcycle to the evaluation. (Tr. 153.) Thus, substantial evidence supports

the ALJ's determination that Dr. Fortin's "very limiting" letters were not consistent with

Kimmel's daily activities.[9]

Nevertheless, while the ALJ properly assessed inconsistency with the record and lack of

supporting evidence, factors relevant to the determination not to give a treating physician's

opinion controlling weight, this should not have ended the ALJ's evaluation of Dr. Fortin's

opinion. Once an ALJ decides not to give a  treating physician's opinion controlling weight, he

must consider other factors required by 20 C.F.R. § 404.1527(d) in determining the proper

weight to assign the physician's opinion.  Here, the ALJ neglected to consider these factors by

failing to take into account (1) the length of Dr. Fortin and Kimmel's treatment relationship and

the frequency of examination, (2) the nature and extent of this treatment relationship, and (3) that

Dr. Fortin was a pain specialist. *See* 20 C.F.R. § 404.1527(d); *see generally Rohan v. Chater*, 98

F.3d 966, 971 (7th Cir. 1996) (finding that an ALJ need not evaluate every piece of evidence in

writing, but must sufficiently articulate his assessment of the evidence to assure that the

---

[9] Kimmel also argues that the ALJ does not adequately explain the inconsistency between Dr. Fortin's
opinion and his daily activities. While the ALJ has a duty to "minimally articulate his . . . justification for rejecting
or accepting specific evidence of disability," he is not required to "provide a written evaluation of every piece of
evidence that is presented." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Here, the ALJ met his burden of
minimal articulation, as he noted Kimmel's daily activities throughout the opinion (See Tr. 11-13), finding these
activities inconsistent with Dr. Fortin's opinions about Kimmel's ability to perform work-related activities that the
ALJ described as "very limiting." (Tr. 14.)

Furthermore, Kimmel claims that the ALJ committed legal error by not following SSR 96-7p because he
did not take into account that the Social Security representative who took Kimmel's application noted that he had
difficulties sitting and standing.  It is difficult to see how SSR 96-7p applies to the ALJ's determination that
Kimmel's daily activities were inconsistent with Dr. Fortin's opinion, since SSR 96-7p provides rules about how to
properly assess the credibility of the claimant's symptoms, specifically pain, and does not pertain to doctors'
opinions.

important evidence has been considered and that the ALJ's path of reasoning can be traced).

Rather than evaluate these factors, the ALJ leaped to assign the "greatest weight" to the opinions

of the State Agency physicians.

### *E. The ALJ's determination that Dr. Stapel's opinion is entitled to little weight is supported by substantial evidence*

On October 31, 2004, Dr. Stapel submitted a "Medical Source Statement" to the Bureau,

to which the ALJ assigned little weight, noting that it was not consistent with or supported by

medical evidence of record and was not consistent with Kimmel's reported activities of daily

living.[10] The ALJ found that Dr. Stapel's opinion appeared to be based on either Kimmel's

subjective allegations or on Dr. Fortin's findings. Indeed, substantial evidence supports this

conclusion, as no medical tests were run on Kimmel's August 11, September 10, or October 8,

2004, visits to Dr. Stapel to determine how his back problems might have improved or

deteriorated since his last visit one year prior.[11]

Unlike his assessment of Dr. Fortin, the ALJ properly gave credence to the requisite

---

[10] Kimmel provides only a three-sentence-long argument in his opening brief to support his position that the ALJ improperly evaluated Dr. Stapel's opinion, claiming that because the reasons the ALJ gave for discrediting Dr. Stapel were essentially the same as the reasons for discrediting Dr. Fortin, the same arguments apply. Kimmel, however, does not specify which of the eight arguments he makes against the ALJ's decision to reject Dr. Fortin's opinion also apply to Dr. Stapel. In fact, it appears that seven of these arguments are specific to Dr. Fortin and have no application to Dr. Stapel.

For example, Kimmel claims that the ALJ's determination that Dr. Fortin's opinion is inconsistent with his daily activities is not supported by substantial evidence, arguing that evidence reveals he needs to alternate between sitting and standing when undertaking daily activities. Kimmel admits that Dr. Stapel provides no opinion regarding Kimmel's need to alternate positions, and since Kimmel provides no other explanations as to how his daily activities are consistent with his doctors' opinions, that argument cannot, without more, be applied to Dr. Stapel.

[11] Interestingly, it appears that only one of these visits was specific to Kimmel's back problems–when Kimmel asked Dr. Stapel on October 8 to provide a "Medical Source Statement" to the Bureau. The other two visits were related to Kimmel's feelings of lethargy as a result of low testosterone levels. In fact, during his August 11 visit, Kimmel reported that he had control of his back pain symptoms. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (cautioning that a treating physician may bring biases to the disability evaluation and find disability too quickly, wanting to do a favor for his patient).

factors discussed *supra*: (1) the length of Dr. Stapel and Kimmel's treatment relationship and frequency of examination; (2) the nature and extent of this relationship; and (3) whether Dr. Stapel is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). The ALJ noted that Dr. Stapel had not seen Kimmel for almost one year–from August 28, 2003, until August 11, 2004. Thus, Dr. Stapel was not very familiar with Kimmel's symptoms when he rendered his October 2004 opinion, especially in light of his lack of medical testing. Furthermore, the ALJ observed that Dr. Stapel previously conceded that he was not the doctor with the greatest familiarity with Kimmel's condition, as Dr. Stapel refused to place Kimmel on work restriction, informing Kimmel that Dr. Fortin was "probably more acquainted with his scenario right now." (Tr. 300.)

Kimmel's sole argument is that the ALJ erred by not taking into consideration that his treatment relationship with Dr. Stapel dated to 1999. The ALJ is not required to "provide a written evaluation of every piece of evidence that is presented," so long as he "minimally articulates his . . . justification for rejecting or accepting specific evidence of disability." *Scheck*, 357 F.3d at 700. Here, the ALJ met his burden of minimal articulation when assigning little to Dr. Stapel's opinion by considering the factors discussed *supra*.

### F. The ALJ did not "play doctor"

Kimmel claims that the ALJ improperly "played doctor" by finding that Kimmel needs to alternate between sitting and standing only every thirty minutes, which he argues "is not taken from the work function medical opinions of record." Although an ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings." *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996), here, however, the ALJ was not making a medical finding. Instead,

he was determining Kimmel's RFC, a decision reserved to the ALJ. 20 C.F.R. § 404.1527(e)(1)

("Although we consider opinions from medical sources on issues such as . . . your residual

functional capacity . . . the final responsibility for deciding these issues is reserved to the

Commissioner."); *Dixon v. Barnhart*, No. 02 C 6410, 2004 WL 603492, at *9 (N.D. Ill. Mar 23,

2004) (citing 20 C.F.R. § 404.1527(e)(1)-(2); *Clifford v. Apfel*, 227 F.3d 863, 872-73 (7th Cir.

2000)) (concluding that the ALJ "is responsible for examining and weighing the evidence of

physical limitations and then determining the appropriate RFC determination").

## V. CONCLUSION

In sum, the ALJ's credibility determination with respect to Kimmel's testimony was not

supported by substantial evidence, and he did not consider all the requisite factors when deciding

to give greater weight to the State Agency physicians' opinions than to the opinion of Dr. Fortin.

In contrast, his determination to give little weight to the opinion of Dr. Stapel was supported by

substantial evidence. Nevertheless, the ALJ's errors may have led to an improper result, and

therefore the decision is hereby REVERSED and REMANDED to the Commissioner for further

findings consistent with this opinion. The Clerk is directed to enter a judgment in favor of

Kimmel and against the Commissioner. SO ORDERED.


Enter for January 19, 2006.


S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge